1  **ESTEBAN-TRINIDAD LAW, P.C.**
   M. Lani Esteban-Trinidad
2  Nevada Bar No. 006967
3  4315 N. Rancho Dr., Ste 110
   Las Vegas, Nevada 89130
4  Telephone: (702) 736-5297
   Fax: (702) 736-5299
5  Attorney for Plaintiff,
   RANDY DOSSAT
6
                    **UNITED STATES DISTRICT COURT**
7                        **DISTRICT OF NEVADA**

8  RANDY DOSSAT, an individual;              )
                        Plaintiff,           )
9  vs.                                       )
                                             )   Case No. 2:09-cv-00245-KJD-PAL
10 HOFFMANN-LA ROCHE, INC. dba ROCHE         )
   LABORATORIES, a New Jersey Corporation;   )
11 ROCHE LABORATORIES, INC., a corporation,  )   **ORAL ARGUMENT**
12 DOES 1 through 10, inclusive; ROES        )   **REQUESTED**
   CORPORATIONS/ENTITIES 1 through 10        )
13 inclusive,                                )
                        Defendants.          )
14
15          **PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
                **MOTION FOR SUMMARY JUDGMENT**
16

17         Plaintiff Randy Dossat ("Plaintiff"), through his attorney, M. Lani Esteban-Trinidad, of

18 Esteban-Trinidad Law, PC, hereby opposes Defendants' Hoffman-La Roche Inc. and Roche

19 Laboratories Inc. Motion for Summary Judgment.  This Opposition is based on the pleadings on

20 file herein, the memorandum of points and authorities attached hereto, the Exhibits attached

21 hereto, and any oral argument that this Honorable Court may permit.

22                                   **I.**
                             **INTRODUCTION**
23

24         This is age-based employment discrimination and retaliation case filed by a fifty-five (55)

25 year old top producing employee who was on the verge of retirement.  In over a decade of

26 employment, Plaintiff earned top ranks and performance achievement awards. When Defendants

27 assigned Plaintiff a new supervisor, James Holloway, Plaintiff's age became an issue that

28 adversely affected the terms and conditions of his employment.  From the onset, Mr. Holloway

                                    -1-

referred to Plaintiff as "old school," not a proper fit for the "new environment," several comments about "retiring," about Plaintiff's "tenure" and references to multiple "lapses in judgment," all of which were objectively and subjectively discriminatory age-based comments.

Plaintiff complained. Defendant did not conduct a proper and through investigation of Plaintiff's age discrimination complaints.  Plaintiff filed a charge of discrimination. Defendant immediately retaliated with adverse employment action.  Defendant issued pre-textual negative write-ups to Plaintiff.  Defendant placed Plaintiff what appeared to be a permanent performance improvement plan.  Defendant actively plotted to terminate Plaintiff's employment as soon as Plaintiff received his Right to Sue letter from the Equal Employment Opportunity Commission (EEOC).  Plaintiff tried to endure as long as he could.  Defendant ultimately succeeded in efforts to oust Plaintiff due to his age and in retaliation for complaining about age discrimination. Plaintiff's can establish at time of trial that "but-for" Plaintiff's age, Defendants would not have taken adverse employment action against Plaintiff.

## II.
## SUMMARY

***First Age-Related "Old School" Comment.***   In January, 2007, Mr. Holloway made first discriminatory comments, calling Plaintiff "Old School" in a demeaning tone.  Plaintiff was "very offended, shocked and embarrassed by his comment." See Dossat Affidavit, at ¶3.

***Second Age-Related "Old-School" Comment.***   In May, 2007, Mr. Holloway conducted a Business Review with Plaintiff. During this time, Mr. Holloway told Plaintiff his methods of managing his team were "Old School." Plaintiff interpreted this to mean "(Plaintiff) was old, that it was because of (Plaintiff's) age.  Plaintiff "felt degraded and humiliated every time he used the words 'old school' to refer to (Plaintiff) or my management style." See Dossat Aff., at ¶4.

***Plaintiff Denied Education Assistance.***   In June, 2007, Defendants denied Plaintiff's request for

education assistance.  Plaintiff "believe(s) that other, younger managers received approvals for this assistance." See Dossat Aff., at ¶5. *__Age-Related Comments on Plaintiff's "Tenure."__*  In July, 2007, Mr. Holloway told Plaintiff that "a manager of Plaintiff's 'tenure' would give more specific direction." See Dossat Aff., at ¶6.  In context of prior comments about Plaintiff being "old school," Plaintiff interpreted Mr. Holloway's comment about "tenure" as another reference to his age. See Dossat Aff., at ¶6.  *__More Age-Related Comments:  Plaintiff told "Accept that Times Have Changed," avoid "Gray Area," "Lapse in Judgment," "Senior Manager."__*  In July, 2007, Mr. Holloway told Plaintiff that Plaintiff "**must accept the realization that times have changed**" and Plaintiff "must do everything that he can to avoid the perception of playing in the **gray area**." See Dossat Aff., at ¶7. Plaintiff interpreted this as a remark on his age. Mr. Holloway said he was disappointed in Plaintiff's **lapse in judgment**. See Dossat Aff., at ¶7. Mr. Holloway stated Plaintiff was a "**Senior Manager** on the team" and did not expect it to happen again. See Dossat Aff., at ¶7.  *__Plaintiff Written-Up for Infraction that Occurred Months Prior; Plaintiff's "Tenure" Commented on Again.__*  On or about August 13, 2007, Mr. Holloway handed Plaintiff a written-warning for a "Blue Book Guideline Violation" for an incident occurring back in May, 2007. Also, Mr. Holloway again commented to Plaintiff that Mr. Holloway "did not expect this from a Division Sales Manager with [Plaintiff's] tenure." See Dossat Aff., at ¶8.  *__Defendants' Begin to Undercut Plaintiff's Authority & Job Responsibilities.__*  In October, 2007, Defendants held a meeting where Mr. Holloway and Ms. Santa Ana asked Plaintiff to contact a representative. Contrary to company policy, both terminated Plaintiff's representative without Plaintiff's knowledge – a process which is Plaintiff's job responsibility. See Dossat Aff., at ¶9. *__Mr. Holloway Tells Plaintiff to Think about Resigning; "Tenure" and "Lapse of Judgment" Mentioned Again; Plaintiff Written-Up for an Infraction Occurring Months Ago.__*  On December 10, 2007, Mr. Holloway met Plaintiff for his

Year-End Review. Mr. Holloway said Plaintiff might not be a good match for the "new environment" with the Company.   See Dossat Aff., at ¶10. Mr. Holloway told Plaintiff he "should think real, real, real hard" if the position of Division Sales Manager in the West Region is the right career choice. See Dossat Aff., at ¶10.  Mr. Holloway also suggested if Plaintiff should choose to leave the Division Sales Manager position, Mr. Holloway would help Plaintiff. See Dossat Affi., at ¶10.  Mr. Holloway also informed Plaintiff "as **a manager with [Plaintiff's] tenure**, [Mr. Holloway] would expect that [Plaintiff] find a way to improve [my] decision-making process." See Dossat Aff., at ¶10. Mr. Holloway provided Plaintiff with another Written Warning concerning an alleged random audit. Mr. Holloway said "this was [Plaintiff's] **second clear lapse of judgment**," which Plaintiff interpreted as based on age and memory because Plaintiff was "old." See Dossat Aff., at ¶10. ***Plaintiff's First Complaint About Age Discrimination to Human Resources.***   On or about December of 2007, Plaintiff complained about Mr. Holloway's age-based discriminatory behavior. See Dossat Aff., at ¶11.  ***Plaintiff denied a Pay Increase with Negative Evaluation from Holloway; Complains to Holloway, Ignored.***  On or about February 22, 2008, Mr. Holloway told Plaintiff that Plaintiff will not have any pay increase because Plaintiff's evaluation "Does Not Meet Rating," even though Plaintiff's sales for 2007 were ranked as some of the highest in the United States throughout Defendants' sixty-one (61) Divisions. ***Second Complaint of Age Discrimination to Human Resources:*** On or about February 26, 2008, Plaintiff filed a second complaint of age discrimination and retaliation with Ms. Cohen and Ms. Kratschmer citing age discrimination and retaliation. ***Other Division Managers Treated More Favorably Than Plaintiff.***  On or about March 10, 2008, Division Manager Michael Tonery sent out a regional-wide email to all Division Managers, highlighting best practices of promoting a product. Plaintiff learned some of these practices were Blue Book and FDA violations. See Dossat Aff., at ¶13. However, Plaintiff believes neither

-4-

Defendants nor Mr. Holloway were ever disciplined or warned the managers and/or representatives who initiated these practices. See Dossat Aff., at ¶13. ***Defendants Close Investigation on Age Discrimination Complaints.*** In March, 2008, Defendants inform Plaintiff that Defendants closed their investigation on Plaintiff's age discrimination complaints because that Ms. Cohen and Ms. Kratschmer did not find evidence to substantiate my claims of age discrimination. See Dossat Aff., at ¶14. ***Mr. Holloway Begins to Retaliate.*** During the week of April 7, 2008, Mr. Holloway refuses Plaintiff's request to review Plaintiff's potential hire. ***Plaintiff files First Charge of Discrimination with NERC/EEOC.*** On or about June 2, 2008, Plaintiff filed a Charge of Discrimination with the NERC and the EEOC. See Dossat Aff., at ¶17. ***Mr. Holloway Reprimands Plaintiff for an Alleged Infraction Occurring Months Ago.*** In August, 2008, Mr. Holloway, Mr. Orosczo, and Regional Director Christian Kamphel conducted Plaintiff's Mid-Year Review. After Plaintiff's presentation, Mr. Holloway talked to Plaintiff, in a reprimanding manner, about an expense report dating back from May of 2008 – an action which should have been mentioned back in May of 2008. Mr. Holloway told Plaintiff in a demeaning way that either Plaintiff is "unwilling or unable to grasp the importance of this competency." See Dossat Affidavit, at ¶19. Plaintiff interpreted this statement as a remark on his age in context of all above mentioned age-related comments directed by Mr. Holloway towards Plaintiff and in retaliation for filing complaints. See Dossat Aff., at ¶19. ***Plaintiff's Learns of Plot to Terminate.*** On or about January 9, 2009, Plaintiff received legal invoicing from Defendants' counsel at his home address. See Dossat Aff., at ¶22. Plaintiff provided this document to his legal counsel, who in turn informed Defendants' counsel. ***EEOC Issues Plaintiff his Right to Sue Letter; Holloway Reprimands Plaintiff Again.*** On or about January 21, 2009, the EEOC issued Plaintiff his Right to Sue letter. See Dossat Aff., at ¶23. On or about the same day, Mr. Holloway conducted Plaintiff's Year-End Review meeting in Ontario, California. During this

meeting, Mr. Holloway informed Plaintiff that Mr. Holloway felt that Plaintiff was still not meeting performance standards. See Dossat Aff., at ¶23. ***Defendants Pressure Plaintiff to Resign or be Placed on a PIP administered by Holloway.*** On January 29, 2009, Defendants' Vice President of Sales Tim George and Ms. Kratschmer called Plaintiff into a meeting in California. During this meeting, both attempted to coerce Plaintiff into resigning his employment by taking a severance or face consequence of a Performance Improvement Plan (PIP) to be administered by Mr. Holloway. See Dossat Aff., at ¶24.  Plaintiff would receive a "Does Not Meet" on his evaluation.  Plaintiff responded that he disagreed with the previous and current rating of "Does Not Meet" on his performance. ***Pressure to Resign Mounts.*** On or about February 6, 2009, Ms. Kratschmer contacted Plaintiff via telephone to continue to discuss Plaintiff's resignation options. Ms. Kratschmer continued to harass Plaintiff with a coerced resignation on at least three (3) separate occasions via telephone and/or voicemail. See Dossat Aff., at ¶25. Plaintiff contacted Ms. Kratschmer by phone and told her Plaintiff wanted to remain employed with Defendant.  See Dossat Aff., at ¶25. ***Second Charges of Discrimination with EEOC***: On or about February 9, 2009, Plaintiff filed a second complaint with the EEOC citing the January, 2009 incident, Ms. Kratschmer's subsequent harassment, and continuing retaliation.

***Plaintiff Receives Another Document Revealing Plans to Terminate Plaintiff.*** On or about February 13, 2009, Plaintiff received another legal invoice – this time in the Interoffice Mail. This invoice stated that on January 21, 2009 and January 22, 2009, Defendants' were preparing to terminate Plaintiff's employment with Defendants. See Dossat Aff., at ¶27.

***Defendants Place Plaintiff on a PIP for 90 Days.*** On or about March 18, 2009, Mr. Holloway told Plaintiff that Plaintiff would be placed on a Performance Improvement Plan (PIP) for ninety (90) days. See Dossat Aff., at ¶28. ***PIP is Extended, Indefinitely.*** On or about July 6, 2009, Mr. Holloway informed Plaintiff that Plaintiff was still on the PIP and that Mr. Holloway would

1    follow-up with me to adjust and extend the dates of the PIP. See Dossat Aff., at ¶32.

2    ***Plaintiff Provided Addendum to PIP.***   On or about July 22, 2009, Mr. Holloway provided

3    Plaintiff with the Addendum to the PIP. See Dossat Aff., at ¶34. ***Mr. Holloway Retaliates.***   On

4
5    or about August 17, 2009, Mr. Holloway again approved the hire without an interview, and then,

6    in a threatening tone, demanded Plaintiff needed to be in San Francisco on August 21, 2009 for a

7    meeting although Mr. Holloway was aware of Plaintiff's previous flight arrangements. Plaintiff

8    interpreted this serious tone and cautious manner as a hint that Mr. Holloway would be

9
10   terminating Plaintiff, in retaliation for complaints. ***Defendants "Terminate" Plaintiff.***   On or

11   about November 15, 2009, while Plaintiff was on medical leave, Defendants sent Plaintiff his

12   "final" paycheck as an apparent "pay-out" on all accrued vacation pay – which happens when an

13   employee is terminated.  See Dossat Aff., at ¶36. Mr. Holloway had to approve sign off on the

14   vacation-pay out. See Dossat Aff., at ¶36. ***Defendants' Advertise Plaintiff's Job.***   On or about

15
16   November 17, 2009, Defendants posted Plaintiff's job position, Division Sales Manager, as an

17   open position.  See Dossat Aff., at ¶37.***Plaintiff Locked Out of Benefits Access.***   On or about

18   November 18, 2009, Plaintiff sent Mr. Holloway and e-mail, advising Mr. Holloway that

19   Plaintiff would be returning to work on November 23, 2009. See Dossat Aff., at ¶38.  While

20   Plaintiff was on leave, Plaintiff attempted to log into Defendants' Benefits website to sign-up for

21
22   2010 Benefits. However, the system would not allow Plaintiff to log-in. Defendant's

23   representative Minnie Mincey told Plaintiff that he had been "deactivated" in the system because

24   Plaintiff's employment termination documentation had been sent to payroll. See Dossat Aff., at

25   ¶38. ***Perpetual PIP.***   On or about November 23, 2009, Plaintiff returned to work following

26   medical leave and contacted Mr. Holloway as requested. See Dossat Aff., at ¶39. Mr. Holloway

27
28   informed Plaintiff that Plaintiff was still under the PIP.  On or about January 8, 2010, Plaintiff

reported to San Francisco per Mr. Holloway's orders. See Dossat Aff., at ¶45. Mr. Holloway

and Ms. Kratschmer told Plaintiff he would be on the PIP again. See Dossat Aff., at ¶45.

***Defendants Post Plaintiff's Job Position as an Open Position.***  On or about January 18, 2010,

Defendants again posted Plaintiff's job position as an open position. See Dossat Aff., at ¶46.

## III.
## UNDISPUTED MATERIAL FACTS

On April 16, 1997, Defendant Hoffman-La Roche hired Plaintiff Randy Dossat ("Plaintiff") as a Division Sales Manager. (See Ex. "1": Bate Nos. DEF00001-DEF00008). Defendants employed Plaintiff for almost eleven (11) years. (See *Motion, Ex.s C, D, and E.*)

## PLAINTIFF'S PERFORMANCE

During his employment, Plaintiff worked under five (5) Regional Sales Directors, three (3) of whom gave him Special Achievement Award, which is one of the highest awards an employee can receive at the Company. (See Ex. "2": Plaintiff Randy Dossat's Supplemental Responses to Hoffman-La Roche, Inc.'s Requests for Interrogatories.)  In 2003, Plaintiff earned Defendants' highest sales award, the President's Club Award. (See Ex. "2"). For the period from 2003 to March 2006, Plaintiff was also regularly awarded instant incentives, management discretionary bonuses, Stretch Trip Awards, Product Contest Awards, and VP Payouts for exceeding target by Defendants. (See Ex. "2").

Defendants gave Plaintiff evaluation ratings on annual basis. In 2004, Defendants awarded Plaintiff a "Full Achievement." (See Ex. "2").In 2005, Defendants awarded Plaintiff a "Superior Achievement." (See Ex. "2"). In 2006, Defendants awarded Plaintiff a "Full Achievement." (See Ex. "2"). Since 2007, Plaintiff regularly earned Annual Performance Increases.  In 2007, Plaintiff's Division was ranked #2 in the whole United States for True Growth, #2 in the Region for TD Share and #2 in the Region for True Growth. (*See Motion, Ex. C, Mid-Year Review, Bates No. DEF00019*). Also, Plaintiff's Division was ranked 1st in the Region and 1st in the Nation for Tamiflu Percent Growth. (See *Motion, Ex. D, Bate No. DEF00042*).  In or about October 2006, Defendant promoted James Holloway as RSP of the Western Region, thereby becoming Plaintiff's new direct supervisor.  In the beginning, in

-8-

Plaintiff's 2007 Performance Review, Plaintiff's Manager James Holloway ("Holloway") acknowledged Plaintiff's outstanding performance, commenting: "[y]our (Plaintiff's) team has consistently ranked in the top 10% of the region for True Growth all year, and your teams [sic] Boniva share has moved ahead of the nation; this is a very nice accomplishment. In fact, your team now has the second highest COT share in the region." (See *Motion, Ex. E, Bate No. DEF00024.*) Further, Mr. Holloway commented: "[p]rograms like [Plaintiff's] work with Inter Valley Health Plan have resulted in favorable position for Boniva Oral." (*Id. at DEF00026.*)

Plaintiff's success continued through 2007. In 2007, Plaintiff's Division 706 won Defendants' Regional Competition by realizing a 2% increase in market share. This was the highest increase realized among all contestants. (See Ex. "3": Market Share in Motion Email dated July 12, 2007, Bate No. RD0556). In 2007, Plaintiff's sales representatives were ranked #1 and #2 best salespeople in the nation for True Growth; three of Plaintiff's representatives received SAA awards for outstanding contribution. (See *Motion, Ex. D, Bate Nos. DEF00047 – DEF00054*). The ratings for Plaintiff's representatives in 2007 were as follows: one 'exceptional', two 'superior', three 'meets high', one 'meets most,' and one 'does not meet'. *Id.* (See *Motion, Ex. D, Bate Nos. DEF00047 – DEF00054*).

## DISCRIMINATORY COMMENTS BASED ON AGE

In or about January, 2007, Plaintiff's supervisor James Holloway repeatedly referred to Plaintiff as "old school." *(*See *Motion, Ex. G, Deposition of Kristine Kratschmer at p. 159:19-25; p. 160:1-5*, Ex. "4": Deposition of James Holloway at p. 192:11-25, 193:1-25, 194:14-25, 195:1-12, 196:23-25, 197:6-8, 198:1-4, 24-25, 199:1-10, and Ex. "18": Plaintiff's Deposition at p. 187: 20-25, 188:1-15, 189:20-25, 190:1-21, 192:21-25, 193:1-13, 25, 194:1-9, 197:4-7, and 198:2-4) On July 11, 2007, Mr. Holloway repeatedly referred to Plaintiff's "tenure" in discussing a matter regarding a Motion Contest and Plaintiff's direction to his team. *Id.* On August 13, 2007, after a Manager's Meeting in California, Mr. Holloway requested Plaintiff meet him in the hotel lobby. See Ex. 6. During this meeting, Mr. Holloway handed Plaintiff a written-warning for a "Blue Book Guideline Violation" for hanging the sign at the Pri-Med Convention back on May 10,

2007—an offense less serious than claimed during the July 31, 2007 meeting and which the punishment is more severe than a typical violation of this kind. (See Ex. "5"). Also, Mr. Holloway informed Plaintiff that he "did not expect this from a Division Sales Manager with [Plaintiff's] tenure." (See Ex. "6").

On December 10, 2007, Mr. Holloway gave Plaintiff both his Mid Year Review and Year End Review, and a Written Warning all at once. (See Ex. "7": Randy Dossat's Mid Year Review, Year End Review, and DEF00036(A)-(B) and DEF 00018-DEF 00030.)  Both Reviews contain written references to Plaintiff's "tenure." Also, Mr. Holloway told Plaintiff that he might not be a good match for the Defendants' "new environment." See Ex. "6". Mr. Holloway told Plaintiff that he "should think real, real, real hard" if the Division Sales Manager in the West Region is the right career choice for him.  See Ex. "6". Mr. Holloway also stated that if Plaintiff chose to leave the Division Sales Manager position, he would help him find another job.  See Ex. "6". Plaintiff disagrees the Written Warning. See Ex, "6".  Plaintiff also disagrees the Mid-Year and Year-End Reviews. See Ex. "6".

**FIRST COMPLAINT OF DISCRIMINATION WITH HUMAN RESOURCES**

On December 14, 2007, Plaintiff filed an age discrimination complaint with Defendants' Human Resources Department. (See *Motion, Ex. H.*) On January 16, 2008, Human Resources talked to Plaintiff.  See Ex. "17."

On February 22, 2008, Mr. Holloway informed Plaintiff that he will not have any increase in salary because he received a "Does Not Meet Rating." See *Motion, Ex. C.* Plaintiff received this rating although his sales for 2007 were ranked as some of the highest in the Nation. (See *Motion*, *Ex. C, DEF00019*; *Ex. D, Bates Nos. DEF00042).*

**SECOND COMPLAINT OF DISCRIMINATION WITH HUMAN RESOURCES**

On February 26, 2008, Plaintiff filed an Amended Complaint with Defendants' Human Resources Department. (See Ex. "8": Age Discrimination Complaint by Randy Dossat 2/26/2007- corrected to 2/26/2008, Bate No. RD00014.)

On March 17, 2008, Defendants closed their investigation on Plaintiff's because of lack of evidence substantiating Plaintiff's claims. (See Ex. "9": Bate No. RD00017.) On June 2, 2008,

1    Plaintiff filed formal charges with the Nevada Equal Rights Commission. (See Ex. "10": Bate

2    Nos. RD00388-RD00390.) On December 30, 2008, Plaintiff requested his Right to Sue letter.

3    On January 14, 2009, Plaintiff was informed of EEOC's receipt of his Right to Sue letter request

4    and the NERC closure of his file. (See Ex. "11": Bate No. RD00130.)  On January 21, 2009, the

5    same day he received his Right to Sue letter, Plaintiff received a negative year-end review from

6    Mr. Holloway. (See Ex. "12": Bate No. RD00377.) On January 29, 2009, the Company's Vice

7    President of Sales Tim George and Human Resources Manager Kristine Kratschmer asked

8    Plaintiff to resign his position. (See Ex. "13": Bate Nos. RD00049-RD00056.)

**IV.**
**ARGUMENT**

### A. Legal Standard.

Defendants are not entitled to summary judgment on any of Plaintiff's four claims. There are material facts in dispute that cannot be resolved before trial. Defendants' motion should be denied.  "[I]n evaluating motions for summary judgment in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1112 (9th Cir. 2004).  This Court should let this case proceed to trial to allow a full airing of all of the evidence of Defendants' acts of unlawful employment discrimination and an opportunity to evaluate the witnesses' credibility.

As the moving party, Defendants bear the burden of establishing that there are no genuine issues of material fact remaining for trial on each of Plaintiff's claims. "The party moving for summary judgment has the burden of proving the absence of any genuine issue of material fact that would allow a judgment as a matter of law." *Hopkins v. Andaya,* 958 F.2d 881, 884 (9th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)), *cert. denied,* 513 U.S. 1148, 115 S. Ct. 1097,130 L. Ed. 2d 1065 (1995).

Defendants have failed to carry their burden. A court evaluating a summary judgment motion must consider all "justifiable" and "legitimate" inferences in the nonmoving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). "Inferences may be drawn from underlying facts not in dispute such as background or contextual facts as well as from disputed underlying facts which the judge must assume will be resolved at trial in favor of the nonmovant." *United Steelworkers of America v. Phelps Dodge Corp.,* 865 F.2d 1539, 1545 (9th Cir.), *cert. denied,* 493 U.S. 809, 110 S. Ct. 51, 107 L. Ed. 2d 20 (1989). The Court must not weigh the evidence and decide which inference is the more plausible one. The jury should decide whether to draw a particular inference. *In re Coordinated Pretrial Proceedings,* 906 F.2d 432, 462-463 (9th Cir. 1990), *cert. denied,* 500 U.S. 959, 111 S. Ct. 2274, 114 L. Ed. 2d 725 (1991).

Defendants' Motion for Summary Judgment must be denied. Plaintiff establishes a prima facie case of age discrimination and retaliation. The presumption against summary judgment is so strong, the opposing party need not offer any evidence or affidavits in order to prevail. "The party opposing the motion is under no obligation to offer affidavits or any other materials in support of its opposition. Summary judgment may be resisted and must be denied on no other grounds than that the movant has failed to meet its burden of demonstrating the absence of triable issues." *Henry v. Gill Indus., Inc.,* 983 F.2d 943, 950 (9th Cir. 1993).

Claims for unlawful employment discrimination are especially ill-suited for disposition by summary judgment. "As a general matter, the Plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because 'the ultimate question is one that can only be resolved through a searching inquiry - one that is most appropriately conducted by a factfinder, upon a full record.' " *Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115,1124 (9th Cir. 2000) (quoting *Schnidrig v.*

*Columbia Mach., Inc.,* 80 F.3d 1406,1410 (9th Cir. 1996)). "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *McGinest,* 360 F.3d at 1112  (citing *Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75, 81-82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). "As a result, ***when a court too readily grants summary judgment, it runs the risk of providing a protective shield for discriminatory behavior that our society has determined must be extirpated.***" *McGinest,* 360 F.3d at 1112 (emphasis added).

**B.    Age Discrimination – Plaintiff's Prima Facie Case**

To prevail in an ADEA case, "[the] Plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.,* --- U.S. ---, ---, 129 S.Ct. 2343, 2351 (2009). "At summary judgment, this question reduces to whether or not the Plaintiff has adduced minimally sufficient evidence to permit a reasonable fact finder to conclude that [he] was [discriminated against] because of [his] age." *Davila v. Corporacion de P.R. Para La Difusion P'blica,* 498 F.3d 9, 16 (1st Cir. 2007).

"To survive summary judgment here, [Plaintiff] must "introduce evidence sufficient to raise a genuine issue of material fact as to whether the reasons [defendant] articulated are pretexts for age discrimination."" *Savina v. Robert Reiser & Company, Inc.,* 2010 WL 331437, at *1 (9th Cir. 2010) (citing *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1282 (9th Cir.2000)). "[Plaintiff] may meet this burden either "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer."" *Savina,* 2010 WL 331437 at *1 (citing *Chuang v. Univ. of Cal. Davis,* 225 F.3d

-13-

1115, 1127 (9th Cir.2000) (citation omitted)). In *Savina*, the Ninth Circuit reversed the lower court's grant of defendant's summary judgment because "[Plaintiff] has produced evidence which could show that [defendant's] proffered explanation for [the adverse employment decision] lacks credibility." *Savina*, 2010 WL 331437 at *1.

### 1.   Elements of Prima Facie Age Discrimination Claim

Defendants misstate the fourth element of prima facie age discrimination case. Plaintiff does not need to be fired by Defendant to prove a prima facie case. Plaintiff can prove the fourth element by showing Defendants took an "adverse employment action" against Plaintiff on the basis of his age, resulting in detrimental change in the terms and conditions of his employment.

The Ninth Circuit defines "adverse employment action" broadly. *Fonseca v. Sysco Food Servs. Of Ariz, Inc.*, 374 F.3d 840, 847 (9th Cir. 2004). The Ninth Circuit "recognized that an adverse employment action exists where an employer's action negatively affects its employee's compensation." *Id.* (citing *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2002) (holding that a reduction in base monthly pay was an adverse employment action event through with commission and bonuses it might have equaled the same net pay); *University of Hawai'I Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1105-06 (9th Cir. 1999) (holding that receiving pay even a couple of days late can seriously affect an employee's financial situation); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding that a warning letter or negative review can be considered an adverse employment action...specifically "transfers of job duties and underserved performance ratings, if proven, would constitute 'adverse employment decisions...'" [1] accord *Chavez v. City of L.A.*, 111 Fed. Appx. 881, 884, 2004 U.S. App. LEXIS

---

[1] In *Ray v. Henderson,* the Ninth Circuit adopted the EEOC's definition of adverse employment action as "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000)* (citing EEOC Compliance Manual Section 8, "Retaliation" Par.

1    20603 at *5 (Sept. 30, 2004) (unpublished opinion) (holding that reassignment to "a less

2    desirable position without opportunity for overtime pay, () reassignment likely constitutes an

3    adverse employment action"); *Fonseca v. Sysco Food Servs. Of Ariz., Inc.*, 374 F.3d 840, 847-48

4
     (9th Cir. 2004 (holding that denial of opportunity to earn overtime pay can be an adverse
5
6    employment actions); *Iwekaogwu v. City of L.A.*, 75 Cal. App. 4th 803, 89 Cal. Rptr. 2d 505, 514

7    (Cal. Ct. App. 1999) (holding that denial of overtime constitutes an adverse employment action).

8            "Adverse employment action" is so broadly defined that "[t]he anti-retaliation provision
9
     does not confine the actions and harms it forbids to those that are related to employment or occur
10
11   at the workplace.  We also conclude that the provision covers those (and only those) employer

12   actions that would have been materially adverse ot a reasonable employee….that means that the

13   employer's actions must be harmful to the point that they could well dissuade a reasonable

14
     worker from making or supporting a charge of discrimination."   *Burlington Nothern & Santa Fe*
15
     *Ry. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2409, 165 L.Ed. 2d 345, (2006).
16

17           Moreover, the benefit denied to Plaintiff need not be employment, it could only be "term,

18   condition or privilege" of employment. *Hishon v. King & Spalding* 467 U.S. 69, 77, 104 S.Ct.

19   2229, 2234 (1984). Pension benefits qualify as terms and conditions of employment even though

20   they are received only after employment terminates. *Id.*  Plaintiff's attached Affidavit
21
     incorporated herein by this reference explains in detail the manner and method by which he was
22
23   discriminated against on the basis of his age and the subsequent retaliation that ensued.

24           Additionally, Defendants concede Plaintiff established the first and third elements of a

25   prima facie case of age discrimination. Defendants only dispute the second and fourth elements
26

27   _____

28   8008 (1998)).   In doing so, the Court noted that this "EEOC test covers lateral transfers,
     unfavorable job references, and changes in work schedules." *Id.*

1    alleging that Plaintiff performed unsatisfactory and that Plaintiff could not show that he was

2    replaced by a younger employee. Plaintiff has enough evidence to raise genuine issues of

3    material fact as to both his job performance and his termination.

4
       i.    **Second Element – Plaintiff's Performance.**
5
6        As to the second element, Plaintiff's work performance, there is genuine issue of material

7    fact. Plaintiff has shown evidence he performed his job not only competently, but above average.

8    Defendants issued Plaintiff negative performance reviews, decreased his bonus target, and issued

9
     written warnings the merit of which Plaintiff is disputing by way of his own testimony.
10
11   Plaintiff's alleged performance issues were pretext to repeatedly seek Plaintiff's resignation.

12   Defendants gave Plaintiff poor performance reviews although Plaintiff's Division was winning

13   Regional Contests, had some of the highest sales in the nation, was repeatedly ranked #1 and #2

14   in the Region, and Plaintiff's representatives were named best salespersons in the nation.

15
     Therefore, there is genuine issue of material fact in regards to Plaintiff's performance and
16
17   Defendants' pretextual reasons for repeatedly trying to force Plaintiff into resigning.

18        Here, as in *Savina*, Defendants discriminated against Plaintiff by not giving him the

19   bonuses and salary increases he deserved, by indeed substantially decreasing his salary for which

20
     Defendants have offered an explanation which too lacks credibility. Although this case differs
21
22   from *Savina* because Defendants did not fire Plaintiff, there are substantive similarities because

23   Defendants strongly encouraged Plaintiff to leave the company although the evidence shows that

24   Plaintiff was one of Defendants' best performing managers.

25        On December 10, 2007, Mr. Holloway met with Plaintiff for his Year-End Review in

26   Ontario, California. Mr. Holloway told that he might not be a good match for the "new

27
     environment" of the Company.  Mr. Holloway told Plaintiff that he "should think real, real, real
28
     hard" if the position of Division Sales Manager in the West Region is the right career choice for

Plaintiff.  (See *Motion, Ex. A, Plaintiff's Personnel File, Bates No's:* DEF00001-DEF00012). Mr. Holloway also stated that if Plaintiff chose to leave the Division Sales Manager position, Mr. Holloway would assist him in finding another employment. On January 29, 2009, Defendants' Vice President of Sales Tim George and Ms. Kratschmer called Plaintiff into a meeting in San Diego, California during the last day of the Regional Sales Meeting. During this meeting, Mr. George and Ms. Krastchmer attempted to convince Plaintiff to resigning his position with the Company by taking a severance package or face the consequence of a Performance Improvement Plan to be administered by Mr. Holloway. (See Ex. 13). Mr. George stated that Plaintiff will be getting a "Does Not Meet" evaluation. Mr. George further refused to discuss any previous Written Warnings or evaluations, which Plaintiff disagreed with. Mr. George informed Plaintiff that "they were at a crossroad" and that there may be options that Plaintiff would be interested in. Ms. Kratschmer then reviewed the severance package offer with Plaintiff. Mr. George stated he realized Plaintiff had a big decision to make and could take sometime to decide.

Further, on or about February 6, 2009, Ms. Kratschmer contacted Plaintiff via telephone to once again discuss resignation options with him. The same day, Plaintiff contacted Ms. Kratschmer telephonically and informed her that he by no means wanted to resign. Ms. Kratschmer continued trying to convince Plaintiff to resign on at least three (3) separate occasions via telephone and/or voicemail. (Ex. 13).

On February 13, 2009, Plaintiff received a legal invoice in the Interoffice Mail. This invoice stated that on January 21, 2009 and January 22, 2009 Defendants' were planning on terminating Plaintiff's employment.

Plaintiff's performance was outstanding. In 2007, Plaintiff's Division was ranked #2 in the whole United States for True Growth, #2 in the Region for TD Share and #2 in the Region for True Growth. *(See Motion, Ex. C, Dossat's 2007 Mid-Year Review, Bates No: DEF00019).*

Also, Plaintiff's Division was ranked 1st in the Region and 1st in the Nation for Tamiflu Percent Growth. (See *Motion, Ex. D, Bates No's: DEF00042*.) In Plaintiff's 2007 Performance Review, Plaintiff's Manager James Holloway ("Mr. Holloway") commented on Plaintiff's performance in the following manner: "[y]our team has consistently ranked in the top 10% of the region for True Growth all year, and your teams [sic] Boniva share has moved ahead of the nation; this is a very nice accomplishment. In fact, your team now has the second highest COT share in the region." (See Ex. "7"). Further, Mr. Holloway commented: "[p]rograms like [Plaintiff's] work with Inter Valley Health Plan have resulted in favorable position for Boniva Oral." (See Ex. "7").

In 2007, Plaintiff's Division 706 won Defendants' Regional Competition by realizing a 2% increase in market share. This was the highest increase realized among all contestants. (See Ex. 3). In 2007, Plaintiff's sales representatives, Donna Amanovic and Catherine Dam, were ranked #1 and #2 best salespeople in the nation for True Growth; three of Plaintiff's representatives received SAA awards for outstanding contribution. (See *Motion, Ex. D, Hoffman-LaRoche Inc. 2007 Year End Communication Sheet, Bate Nos. DEF00047 – DEF00054*). The ratings for Mr. Dossat's representatives in 2007 were as follows: one exceptional, two superior's, three meets high, one meets most and one does not meet. *Id.*

As in *Savina*, although Plaintiff was performing mildly but competently as a salesman, Defendants were trying to point out to alternative measure of his performance, like performance reviews and Written Warnings with no merit that Defendants themselves gave Plaintiff. "In response to this evidence demonstrating that [Plaintiff] was performing competently as a salesman, [defendant] points to alternative measures of [Plaintiff's] performance: a panoply of complaints regarding [Plaintiff's] work." *Savina*, 2010 WL 331437 at *1. In *Savina*, defendant claimed that Plaintiff "was not responsible for many of the sales attributed to him, that he failed to realize the sales potential of his territory, and that he failed to sell a variety of [defendant's]

products. Plaintiff disputes defendant's laundry list of accusations[.]" by relying "not only on his own detailed testimony, but also on the declarations of several former customers and a former co-worker." Id. In *Savina*, the Ninth Circuit found "several genuine disputes of material fact relating to [defendant's] complaints about [Plaintiff's] performance. . . sufficient to preclude summary judgment in favor of [defendant.]" Id.

This case is very similar to *Savina* in that Plaintiff has shown evidence that there is genuine issue of material fact relating to Defendants' complaints about Plaintiff's performance. Plaintiff has shown evidence that he was performing his job not only competently, but above average. Defendants issued Plaintiff negative performance reviews, decreased his bonus target, and issued written warnings the merit of which Plaintiff is disputing by way of his own testimony. Defendants used their complaints as to Plaintiff's performance as a pretext to repeatedly seek Plaintiff's resignation. Defendants gave Plaintiff poor performance reviews although Plaintiff's Division was winning Regional Contests, had some of the highest sales in the nation, was repeatedly ranked #1 and #2 in the Region, and Plaintiff's representatives were named best salespeople in the nation. Therefore, there is genuine issue of material fact in regards to Plaintiff's performance and Defendants pre-textual reasons for repeatedly trying to force Plaintiff into resigning from his position.

**ii.    Fourth Element – Defendants' "Administrative Termination" of Plaintiff Is a "Constructive Discharge" & Defendants Adversely Changed Terms, Conditions and Privileges of Employment.**

In trying to force Plaintiff to resign from his position and in creating an intolerable environment for Plaintiff, Defendants "constructively discharged" Plaintiff. Plaintiff did not voluntarily quit his job, Defendants terminated him. Motion, 4-4. Defendants claim that they administratively discharged Plaintiff because Plaintiff's STD leave allowed him to be out for up to 182 days annually and Plaintiff allegedly was out for more than the allowed amount of days.

However, even if this was true, Defendants' discharge of Plaintiff still qualifies as a "constructive discharge."

An employee's resignation may give rise to a discrimination lawsuit where the circumstances surrounding it amount to a constructive discharge, i.e. where a reasonable person would feel compelled to resign because the employer intentionally caused objectively intolerable working conditions or knowingly allowed them to exist. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 143-44, 124 S.Ct. 2342, 2352 (2004). The test is whether all of defendants' actions taken together would cause a reasonable person in plaintiff's position to resign. *Wallace v. City of San Diego*, 479 F.3d 616, 625 (9Cir. 2007) ("looking at the totality of circumstances").

Here, looking at the totality of circumstances, Defendants were trying to push Plaintiff to resign. Defendants also created intolerable work conditions for Plaintiff that would make a reasonable person resign. Even if Defendants dispute these facts, Plaintiff has enough evidence to raise a genuine issue of fact. A jury should weigh the evidence and decide whether a reasonable person would consider Defendants' actions to constitute forced resignation.

On February 6, 2009, Ms. Kratschmer contacted Plaintiff via telephone to once again discuss resignation options with him. The same day, Plaintiff contacted Ms. Kratschmer telephonically and informed her that he by no means wanted to resign. Ms. Kratschmer continued trying to convince Plaintiff to resign on at least three (3) separate occasions.. (See Motion, Ex. B, Randy Dossat's Notes, Bates No's RD00056).

On December 10, 2007, Mr. Holloway met with Plaintiff for his Year-End Review.. Immediately, Mr. Holloway handed Plaintiff his Mid-Year Review from July 31, 2007 with Mr. Holloway's manager comments. Mr. Holloway stated "sorry, I am a little behind." Mr. Holloway told Plaintiff that Plaintiff might not be a good match for the new environment with the Company. Mr. Holloway told Plaintiff that he "should think real, real, real hard" if the position

-20-

of Division Sales Manager in the West Region is the right career choice for Plaintiff.  (See Ex. 6).  Mr. Holloway also suggested that if Plaintiff should choose to leave the Division Sales Manager position, Mr. Holloway would help Plaintiff. Mr. Holloway also informed Plaintiff that "as a manager with [Plaintiff's] tenure, [Mr. Holloway] would expect that [Plaintiff] find a way to improve [his] decision-making process." (See Ex. 7). Also during this meeting, Mr. Holloway provided Plaintiff with another Written Warning concerning an alleged recent and random Accounts Payable audit.  Mr. Holloway commented that "this was [Plaintiff's] second clear lapse of judgment," which Plaintiff interpreted as a comment on Plaintiff's age and memory therein. (See Ex. 6 and Ex. 7). Plaintiff inquired as to why it had taken Mr. Holloway such a long period of time to provide Plaintiff with the previous Written Warning concerning the alleged May incident, and that this alleged offense may have been prevented if Mr. Holloway had provided Plaintiff with the Written Warning form the Alleged May incident. Mr. Holloway requested that Plaintiff sign the Written Warning which Plaintiff requested time to review. As a result, Mr. Holloway became very aggressive, and Plaintiff felt threatened. (See Ex. 6). Plaintiff believed the two Written Warnings given by Mr. Holloway were part of Mr. Holloway's discrimination against him by reason of his age.  (See Ex. 6).

On January 29, 2009, Defendants' Vice President of Sales Tim George and Ms. Kratschmer called Plaintiff into a meeting in San Diego, California during the last day of the Regional Sales Meeting. During this meeting, Mr. George and Ms. Krastchmer attempted to coerce Plaintiff into resigning his position with the Company by taking a severance package or face the consequence of a Performance Improvement Plan to be administered by Mr. Holloway. (See Ex. 13). Mr. George informed Plaintiff that "we want to make this a comfortable and amiable environment," and "this is the first time that we have really talked." Mr. George claimed that Plaintiff would receive a "Does Not Meet" on his evaluation.  Plaintiff mentioned that he

disagreed with the previous and current rating of "Does Not Meet" on his performance. Mr. George inquired if Plaintiff received Mr. Holloway's Year-End Review letter. Plaintiff informed Mr. George that he had not been provided one yet. Ms. Kratschmer inquired if Plaintiff had seen the comments in Plaintiff's Performance Management Yearbook online. Plaintiff informed Ms. Kratschmer that he had not seen any comments online. Mr. George stated that this notion did not make a difference because Plaintiff would still receive a "Does Not Meet." Mr. George further refused to discuss any previous Written Warnings or evaluations. Mr. George informed Plaintiff that "they were at a crossroads" and that there may be options that Plaintiff would be interested in. Ms. Kratschmer then reviewed the severance with Plaintiff. Mr. George stated he realized that Plaintiff had a big decision to make and could take sometime to decide.

On November 15, 2009, Defendants sent Plaintiff his "final" paycheck evidencing an apparent "pay-out" on all his accrued vacation pay – which is a typical action only when an employee has been terminated from employment.   (See Ex. "14": Randy Dossat's "Final" Paycheck, Bate No. RD00516). On November 17, 2009, Defendants posted Plaintiff's position, Division Sales Manager, job location in Southern California (Plaintiff was Defendants' only Division Sales Manager for that Region) as an open position. Further, in November 2009, while Plaintiff was on leave, Plaintiff was unable to log into Defendants' Benefits website to sign-up for 2010 Benefits. Plaintiff contacted Integrated Disability Representative Minnie Mincey who informed him that he was "deactivated" in the system because termination documentation had been sent to payroll for Plaintiff.

Additionally, Defendants treated Plaintiff differently from other similarly situated employees. On March 10, 2008, Division Manager Michael Tonery sent out a regional-wide email to all Division Manager, including Plaintiff and Mr. Holloway, highlighting best practices of promoting a product. Upon review of this email, some of these practices are Blue Book

Guideline violations and FDA violations. (See Ex. "15": Email dated March 10, 2008 Subject: Sacramento United Best Practices, Bate No. RD00045). However, neither Defendants nor Mr. Holloway ever disciplined or warned the managers and/or representatives who initiated these practices. In fact, Defendants legitimized these practices for product promotion, even though these practices violated Blue Book Guidelines. (See Ex. 15).

Alternatively, Plaintiff can also prove the fourth element by showing that Defendants took an adverse employment action against Plaintiff in changing his terms and conditions of his employment. The benefit denied to Plaintiff need not be employment, it could only be "term, condition or privilege" of employment. *Hishon v. King & Spalding* 467 U.S. 69, 77, 104 S.Ct. 2229, 2234 (1984). Pension benefits qualify as terms and conditions of employment even though they are received only after employment terminates. *Id.* Here, by constructively discharging Plaintiff, Defendants are in effect denying him pension benefits. Defendants have tremendously decreased Plaintiff's bonus target.   (See *Motion, Ex. F, Memo from Human Resources to Plaintiff, Bates No's: DEF000303.*) Defendants put Plaintiff on an unusually long Performance Improvement Plan ("PIP"). On March 18, 2009, Mr. Holloway placed Plaintiff on a Performance Improvement Plan for ninety (90) days. During this time, Plaintiff was also provided a written Performance Improvement Plan. (See Ex. "16": Performance Improvement Plan dated March 18, 2009, Bate Nos. DEF00433-DEF00442). The PIP lasted until Plaintiff's was forced to resign.

**2.     Holloway Admits "Old School" Could Be Understood to Refer to Age.**

Defendants made derogatory comments towards Plaintiff in regards to Plaintiff's age which were probative of age discrimination. Plaintiff's Manager Mr. Holloway repeatedly referred to Plaintiff by calling him "old school." See *Motion, Ex. G, Deposition of Kristine Kratschmer at p. 159:19-25; p. 160:1-5.* Holloway admitted that his comments to Plaintiff could be interpreted to refer to age, not just management style. (See *Motion, Ex. M, HR handwritten*

*notes, Bates Nos. DEF00748-49.*) During Defendants' investigation of Plaintiff's internal complaint, HR Manager Sharon Cohen has put down in her notes the conversation she had with Holloway regarding Holloway's "old school" comments to Plaintiff:

> Sharon Cohen: Can you see how someone would misconstrue?
> **James Holloway: Yes, ... I recognize that someone would think it's about age.**
> (*See Motion, Ex. M, HR handwritten notes, Bates Nos. DEF00748-49*) (Emphasis added.)

Defendants try to support their argument that allegedly "old school" does not refer to age by citing to case law. *Motion, p. 27*. However, this case is different because Holloway, the one who discriminated against Plaintiff, has explicitly admitted he could see how someone could interpret "old school" to refer to age. This changes everything. This shows Holloway's understanding of the term and his motive in its usage. It is no longer just a "stray remark" about management style, it is now about age because the one who used to term concedes he is aware that "old school" could refer to age. A jury needs to decide on which occasions of his use of "old school," Holloway used the term to refer to age and on which occasions - to management style.

Moreover, even if used in reference to management style, "old school" could still be probative of intent to discriminate based on age. *Palasota v. Haggar Clothing Co.*, 342 F.3d 569 (5th Cir. 2003). "Upper management's comments that the company needed race horses, not plow horses, that 51-year-old sales associate's sales techniques were out of the "old school" of selling . . . were probative of employer's intent to discriminate based upon age, for purposes of sales associate's ADEA claim." *Palasota*, 342 F.3d 569. As in *Palasota*, Plaintiff's manager repeatedly referred to Plaintiff's sales techniques as "old school." Although, Mr. Holloway denies ever using the term "old school" in regards to Plaintiff (See Ex. 4), Ms. Kratschmer admits that Mr. Holloway told her he has referred to Plaintiff as "old school." (*See Motion, Ex. G, Deposition of Kristine Kratschmer at p. 159:19-25; p. 160:1-5.*) According to Ms. Kratschmer, Mr. Holloway told her he used "old school" to mean "retro style, [which is] not

current," and "it's not progressive." *Id. at p. 160 line 13-15*. To sum up, it is Defendants' contention that whenever Holloway referred to Plaintiff as "old school" he was referencing Plaintiff's style which was not progressive and not current. This is exactly like in *Palasota*, where the upper management referred to Plaintiff's sales techniques as being "old school." *Palasota*, 342 F.3d 569. Additionally, Mr. Holloway told Plaintiff that Plaintiff might not be a good match for the "new environment" of the Company. Therefore, Defendants repeated use of "old school" and statements that Plaintiff should resign because he might not be a good match for the company's "new environment"  are probative of employer's intent to discriminate based upon age, for purposes of Plaintiff's ADEA claim.

**3.          Holloway Used Terms "Tenure" To Refer to Those Who "Need to Retire."**

From the same notes, evidencing the conversation between HR and Holloway, when HR Manager Kratschmer asked Holloway if he has had any conversations about managers who "need to retire" his response immediately referenced "managers with tenure." (See *Motion, Ex. M, HR handwritten notes, Bates Nos. DEF00749.*)

> Kristine Kratschmer: Any comments about **managers who need to retire?**
> James Holloway: Discussions around **managers with tenure** – Gail Hunter approached me. Good conversation. He'll do it on his timetable… Conversations do happen.
> (See *Motion, Ex. M, HR handwritten notes, Bates No's: DEF00749*) (emphasis added)

**D.          Retaliation Claim.**

Plaintiff engaged in a protected activity by filing an age discrimination claim against Defendants.  Plaintiff suffered an adverse employment action as described above.  Not only proximity but direct documentary evidence establishes the causal link between the activity and the employment decision, because both Holloway and HR took adverse employment actions against Plaintiff. Defendants' argue that there is no retaliation because Holloway did not find out about Plaintiff's age discrimination complaints until February 6, 2009. Motion, 3:28-25; 1:3-26.

Defendants claim this is an undisputed fact. *Id.* at 27:28-25; 1:3-26. This is wrong. There is evidence that Holloway knew about Plaintiff's complaints against him well before February 6, 2009. In Ex.s attached to Kratschmer's deposition, there are notes of an interview with Holloway dated January 25, 2008, in which he is asked about the "old school" comments that he made. See Ex. 17, at DEF00747-DEF0749. There is an issue of fact as to when Holloway found out about Plaintiff's age discrimination allegations against Defendants.

Holloway retaliated against Plaintiff subsequent to Plaintiff filing his first internal age discrimination complaint by giving Plaintiff poor performance reviews (as shown above), reduction of variable pay, termination threats and conversations pushing Plaintiff to resign (as shown above).   Defendant took adverse actions against Plaintiff by the way they handled Plaintiff's internal complaints. There is also genuine issue of material fact as to the effectiveness and properness of Defendants' handling of Plaintiff's complaints as well as the adequacy and implementation of Defendants' age discrimination policies.

Defendants do not have an age discrimination policy at place. (See Ex. "17": Deposition of Kratschmer at p. 97 line 20.) Kristine Kratschmer, Defendants' own Human Resources Manager is completely unfamiliar with Defendants' age discrimination policies, if any. Ms. Kratschmer's, in her deposition, responded to a question regarding Hoffman-La Roche's discrimination policy in the following manner, "[w]e don't have an age discrimination policy." (See Ex. 17.) Ms. Kratschmer further stated that Hoffman-La Roche has an "EEOC best employee practices where [it] discourage[s] age discrimination." *Id.* at p.97 line 21-22. When asked if she can explain "anything more" about that policy, Ms. Kratschmer stated that she could not do that without referring to the document. Id. at p.98 line 5-6.

According to Ms. Kratschmer, she herself received age discrimination training instituted by Defendants, "quite a few years" ago. Further, Ms. Kratschmer does not remember anything

that she has learned at that training or on how many occasions she received training during her employment with Defendants. *Id.* at p. 99 line 25; p. 100 line 1-12.  Apparently, the person that should be most familiar with supervising and preventing discrimination within the Company thinks that Defendants do not have an age discrimination policy, is unable to explain "anything" about any age discrimination policy at place and does not remember anything she learned during the training she received. Therefore, there is genuine issue of material fact in relation to the existence and compliance with an age discrimination policy within Defendants' companies.

## NO PROPER & THROUGH INVESTIGATION OF PLAINTIFF'S COMPLAINTS

Defendant did not properly or thoroughly investigate Plaintiff's complaints.  The problem in this case is that when discrimination allegations were made by Plaintiff, Defendants either conducted no investigation at all, or did not do a through investigation.  As such, Defendants did not follow standard practices and did not follow its own polices and procedures.  The EEOC states in its Guidance, "The amount of time that it will take to complete the investigation will depend on the particular circumstances.  The Equal Employment Opportunity Commission's (EEOC) position is clear that a duty to investigate harassment allegations exists--- "When an employee complains to management about alleged harassment, the employer is obligated to investigate the allegation..." *Enforcement Guidance:   Vicarious Employer Liability for Unlawful Harassment by Supervisors (June 1999).* When asked how she handles discrimination complaints, Ms. Kratschmer responded she did not how to do that without referring to her "policy manual." See Id. at p. 103 line 15-25.  However, she did not refer to that policy manual when she investigated Plaintiff's complaint. See id. at p. 102 line 5-7. Ms. Kratschmer did not handle Plaintiff's complaint properly because she did not refer to the "policy manual" which she would usually do whenever she received a complaint in light of her not knowing/remembering how to handle a complaint otherwise.

On March 17, 2008, Ms. Cohen and Ms. Kratschmer contacted Plaintiff and informed Plaintiff that Defendants had closed their investigations on Plaintiff's complaints on the ground that Ms. Cohen and Ms. Kratschmer did not find evidence to substantiate Plaintiff's claims. (See Ex. 9). This was all done over the telephone. "In most investigations, there will be conflicting versions of material events. For example, the Complaining Party will claim that certain conduct occurred, while the Responding Party will claim it did not occur. Determining credibility is crucial to a proper investigation." Workplace Investigations: Understanding  Standard Practice." *Bender's California Labor & Employment Bulletin (May/June 2010).* As the EEOC says in its Guidance, "[i]f there are conflicting versions of relevant events, the employer will have to weigh each party's credibility. Credibility assessments can be critical in determining whether (the conduct complained of) in fact occurred." EEOC Guidance, Investigating Workplace Harassment. Therefore, there is genuine issue of material fact in regards to the propriety and impartiality of the investigation into Plaintiff's complaints.

**E.**     **Plaintiff's Intentional Has Claims for Infliction of Emotional Distress Claim.**

Plaintiff can establish each element of the claim for intentional infliction of emotional distress and Defendants have not explained in their motion why they believe Plaintiff would be unable to do this. Defendants have simply made a conclusory statement that Plaintiff allegedly could not show that Defendants conduct was outrageous and that in the event all other claims were dismissed, the claim for intentional infliction of emotional distress would get dismissed as well. *Motion, 19:23 – p. 29.* This is not only conclusory but also incorrect. Plaintiff is entitled to a determination by a trier of fact as to whether or not Defendants actions were extreme and outrageous. Defendants made up their mind to terminate Plaintiff shortly after he complained about discrimination. They retaliated against him by placing him on a never-ending PIP. They wrote Plaintiff up for instances that occurred months ago. They had Plaintiff report back to the

-28-

same supervisor that Plaintiff alleges discriminated against him on the basis of his age.   This is not just about a job, it involves Plaintiff's career.   The loss that Plaintiff's damages expert estimates to be in excess of $1,000,000.00.   Plaintiff has shown that (1) Defendants acts were extreme and outrageous in the way Defendants treated Plaintiff differently than other employees, changed his terms and conditions of employment, reduced his pay, consistently gave him negative performance reviews despite his excellent performance, punished him for alleged incidents harsher than required by Defendants' guidelines and pushed him into early and premature retirement; (2) Plaintiff suffered emotional distress – "anxiety disorder with depression" (See *Motion, Ex. D* – last two pages); and (3) Plaintiff suffered emotional distress as a result of Defendants' outrageous conduct during his employment with Defendants, which is why Plaintiff had to go out on medical leaves. Mr. Holloway also insisted on being present at Plaintiff's deposition – writing notes to counsel, essentially a direct interrogation by an alleged harasser of his accuser, while he was still employed.

**F.**     **Plaintiffs' Claims Are Not Time Barred.**

Any discrimination and retaliation which may have occurred 300 days before Plaintiff filed his NERC charges are still part encompassed as part of one continuing unlawful practice. A "series of separate acts … collectively constitute one "unlawful employment practice." The timely filing provision only requires that plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter that some of the component acts of the hostile work environment fall outside the statutory time period. If an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 2074 (2002). "Subsequent events … may still be part of the one hostile work environment claim and a charge may be filed at a later date and still

encompass the whole." *Id.* "[B]ecause the entire hostile work environment encompasses a single unlawful employment practice …we do not hold, as have some of the Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct." *Id.* at 117-118.  Defendants' acts taken as a whole are one "unlawful employment practice" of age discrimination and/or retaliation and are therefore encompassed in the whole, none of Defendants single acts which occurred prior to the 300 days of the NERC charge are time-barred.

## IV.
## CONCLUSION

Based upon the foregoing, Plaintiff respectfully requests this Court to deny Defendants' Motion for Summary Judgment in its entirety.

DATED this 7th day of June, 2010.

ESTEBAN-TRINIDAD LAW, P.C.

By: _____
M. Lani Esteban-Trinidad
Nevada Bar No. 006967
4315 N. Rancho Dr., Ste 110
Las Vegas, Nevada 89130
Telephone: (702) 736-5297
Fax: (702) 736-5299

## CERTIFICATE OF MAILING

I HEREBY CERTIFY that on the _____ day of June, 2010, I served a true and correct copy of the foregoing Opposition upon the appropriate parties hereto, by enclosing it in a sealed envelope, postage fully prepaid thereon, deposited in the United States mail, addressed to:

Robert Rosenthal
Howard & Howard
3800 Howard Hughes Parkway #1400
Las Vegas Nevada 89169
Attorney for Defendants


_____
Employee of Esteban-Trinidad Law, P.C